# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | |
| OLIVER NINO-HERRERA, | Case No. |
| Defendant. | 5:25-mj-00218-duty |

**FILED**
CLERK, U.S. DISTRICT COURT
04/17/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: RAM   DEPUTY

**LODGED**
CLERK, U.S. DISTRICT COURT
4/17/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: jb   DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On April 15, 2025, in the county of Riverside in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii)(II) | See attached affidavit |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Carlos B. Fregoso
_____
Complainant's signature

HSI Task Force Officer, Carlos B. Fregoso
_____
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: April 17, 2025

Judge's signature

City and state: Riverside, California

Honorable David T. Bristow, U.S. Magistrate Judge
_____
Printed name and title

AUSA: Erin Kiss (951-276-6259)

**AFFIDAVIT**

I, Carlos B. Fregoso, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1.  This affidavit is made in support of a criminal complaint against OLIVER NINO-HERRERA ("NINO") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii)(II).

2.  This affidavit is also made in support of an application for a warrant to search one digital device, a black iPhone 13 with a black Otter box case, currently in the custody of Homeland Security Investigations ("HSI") in San Bernardino, California, as described more fully in Attachment A (the "SUBJECT DEVICE").

3.  The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant, and it does not purport to set forth all my knowledge of or investigation into this matter.  Unless

specifically noted otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.  I am a Border Patrol Agent with the Department of Homeland Security, Customs and Border Protection, United States Border Patrol ("USBP"). I have been employed as a full-time, sworn federal agent with the USBP since August 23, 2010, having graduated from the USBP Basic Border Patrol Training Academy located in Artesia, New Mexico. The academy curriculum covers specialized training in the Immigration and Naturalization Act, criminal law, and statutory authority, as well as cross-training in Titles 19 and 21, United States Code.

6.  I am currently assigned to the Homeland Security Investigations ("HSI"), Inland Empire ("IE"), Border Enforcement Security Taskforce ("BEST") as a Task Force Officer ("TFO"). IE BEST agents are tasked with the responsibility of investigating, arresting, and prosecuting narcotics smuggling and alien smuggling organizations that utilize the Southern and Central Districts of California as an operational corridor. IE BEST agents are also tasked with investigating bulk cash smuggling and a variety of other federal and state offenses. IE BEST agents deploy in plain clothes attire and drive unmarked government cars.

7.  During my employment with USBP, I have participated in investigations that have resulted in criminal prosecutions. I have also participated in alien smuggling investigations that

2

have resulted in federal and criminal charges.  Additionally, I have made arrests and prepared reports in federal proceedings. Through my training and experience, I have gained a working knowledge and insight into the typical workings of criminal organizations.  I have also gained extensive information as to the normal operational habits of persons who make their living as alien and narcotics smugglers.

8.   As for my training, experience, and education, in 2022, I earned a bachelor's degree in Criminal Justice with an emphasis in Management from the University of Phoenix.  I have conducted and participated in numerous investigations into crimes involved in trafficking of controlled substances, firearms, and laundering of proceeds derived from controlled substances, other specified unlawful activities as the lead investigator and in a supporting role to other investigations led by other agents and officers.  I have been involved in investigations concerning the unlawful manufacture, cultivation, possession, distribution, and transportation of controlled substances, in violation of 21 U.S.C. §§ 841 and 846.  I have participated in different aspects of investigations, including, but not limited to, physical surveillances, electronic surveillances, physical and digital evidence gathering, undercover operations, source gathering, informant handling, and execution of search and arrests warrants, which resulted in the apprehension of suspects and seizure of firearms, narcotics, real property, and proceeds.

9. Furthermore, through my training, education, experience, conversations with other case agents, senior narcotics investigators, debriefing of confidential sources (informants), interviewing of defendants, suspects, and witnesses, whom have personal knowledge of trafficking-controlled substances, I have become familiar with the tactics and measures that drug traffickers use to obtain, conceal, possess, transport, and/or sell controlled substances. I have also become acquainted to the methods, language, and terms used by drug traffickers and members of organized crime.

### III. SUMMARY OF PROBABLE CAUSE

10. On April 15, 2025, U.S. Border Patrol Agents ("BPAs") stopped Oliver NINO-HERRERA ("NINO") while he was driving on I-15 north in Temecula, California, after a BPA observed the vehicle NINO was driving, a gray Toyota Tacoma ("V-1"), conduct erratic lane changes and drive much slower than the flow of traffic. BPAs found approximately 11.4 kilograms of cocaine and the SUBJECT DEVICE within V-1. In a Mirandized interview, NINO gave written and verbal consent to the search of his phone. NINO stated that he picked up the 11.4 kilograms of cocaine and placed two bricks of cocaine in a toolbox and eight bricks of cocaine in a white five-gallon bucket located in the bed of the Toyota Tacoma. NINO stated that he planned to transport the cocaine to Bell Gardens, California.

## IV. STATEMENT OF PROBABLE CAUSE

11.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.   Border Patrol Stop**

12.  On April 15, 2025, BPA Noe Soto along with his canine partner "Radek," assigned to the Newton-Azrak Border Patrol Station ("MUR"), were conducting a targeted enforcement and anti-smuggling operation within the MUR Area of Responsibility. Agents routinely conduct their enforcement activities along the I-15 corridor.  This area is located approximately 70 miles from the United States/Mexico International Border and is a well-known and documented corridor used by illegal entrants and smugglers to transport illicit cargo north into the interior of the United States.

13.  BPA Soto is familiar with the appearance and behavior of individuals involved in smuggling undocumented aliens, narcotics, and contraband into the United States.  BPA Soto apprehended numerous smuggling loads along the I-15 smuggling corridor and has received training that includes but is not limited to highway interdiction, behavior analysis, and interview techniques including detecting deception and eliciting responses.

14.  At approximately 8:10 p.m. on April 15, 2025, BPA Soto was watching northbound vehicle traffic near the I-15 northbound near the Temecula Border Patrol Checkpoint, at a turnaround located in the median, from an unmarked Border Patrol K9

5

vehicle.  BPA Soto was in full duty uniform visible to the motoring public.  At approximately 8:15 p.m., V-1 passed BPA Soto's position.  BPA Soto observed the driver of V-1 (later identified as NINO) noticeably slow his rate of speed compared to the flow of traffic.  According to BPA Soto, this was an unusual response.  Based on my training and experience, I know that it is common for drivers of narcotics-laden vehicles to slow down to avoid law enforcement detection.

    15.  BPA Soto drove next to V-1, making sure that NINO could see the K9 placard on BPA Soto's driver-side window and BPA Soto's full duty uniform, clearly showing his law enforcement presence.  NINO then noticeably slowed V-1 down and began falling behind the rest of traffic as if NINO was attempting avoid BPA Soto.  BPA Soto contacted dispatch and conducted records checks on V-1.  BPA Soto maintained visual observation of V-1 while dispatch was conducting records checks. BPA Soto observed V-1 switch lanes repeatedly and ultimately was able to position himself behind V-1, as V-1 approached the I-15/I-215 split. V-1 was traveling northbound in the number three lane that would lead him onto the I-215 north.  As soon as BPA Soto positioned himself directly behind V-1, NINO immediately switched lanes leading him back onto the northbound I-15 lanes.  Based on my training and experience, I believe this was an attempt made by NINO to avoid law enforcement detection. BPA Soto activated his emergency lights and sirens, and attempted a vehicle stop.  NINO yielded to BPA Soto on the shoulder of the I-15 near the Murrieta Hot Springs exit.

16. BPA Soto approached V-1 and conducted an immigration inspection of NINO. NINO informed BPA Soto that he is a citizen of Mexico and is currently residing in San Diego, California. BPA Soto asked NINO for his identification in which, according to BPA Soto, NINO nervously complied. BPA Soto then conducted records checks on NINO via dispatch. Records checks on NINO revealed a silent alert for immigration violations. Due to NINO's erratic driving and nervous behavior, BPA Soto asked NINO to exit V-1. BPA Soto questioned NINO regarding the ownership of V-1. NINO stated that he is the owner of V-1; however, V-1 is registered in NINO's wife's name, G.A. BPA Soto requested consent from NINO to search V-1 by using his canine partner. BPA Soto explained to NINO that his canine is trained to detect concealed humans and illegal narcotics. NINO granted BPA Soto verbal consent to search V-1 and was placed at near the rear bed of BPA Soto's agency vehicle.

17. BPA Soto brought out his canine partner and conducted a search of V-1. During the search, the canine alerted to the rear bed of V-1, suggesting the presence of a controlled substance. BPA Soto then placed his K9 partner back into his agency vehicle and conducted a thorough search of V-1's rear bed area. Upon searching, BPA Soto discovered a white five-gallon bucket containing eight wrapped packages containing a white powdery substance that appeared to be narcotics. Additionally, BPA Soto located a black plastic trash bag containing an additional two bundles, which were similar in appearance to

those found in the five-gallon bucket, located inside a large toolbox.

18. At approximately 8:42 p.m., BPA Soto placed NINO under arrest for the transportation of narcotics. NINO, V-1, and the suspected narcotics were transported to the Murrieta Border Patrol Station for further processing. At the Murrieta Border Patrol Station, Supervisory Border Patrol Agent ("SBPA") Luis Silva tested a sample of the white powdery substance using the NARK-II kit, resulting positive for properties consistent with cocaine.

19. Also, in V-1, BPAs found a black iPhone (the "SUBJECT DEVICE"). NINO claimed ownership of the SUBJECT DEVICE.

20. Border Patrol contacted HSI Riverside to respond and take over the investigation. Special Agent ("SA") Giovanni Cuevas and I, both assigned to HSI Riverside's Inland Empire Border Enforcement Security Taskforce, responded to the station to interview NINO and assume the investigation.

**B.   NINO's Interview**

21. At approximately 11:33 p.m., HSI SA Cuevas and TFO Fregoso, conducted a <u>Mirandized</u> interview of NINO. During the interview, NINO stated that his true and complete name is Oliver NINO-HERRERA and he was born in Acapulco, Guerrero, Mexico. NINO stated he is currently residing with his girlfriend, G.A., in San Diego, California.

22. At approximately 11:35 p.m., NINO gave verbal and written consent to search the SUBJECT DEVICE, a black iPhone 11

with a black Otter box case that was in his possession. NINO provided the code for the black iPhone.

23. NINO admitted to intending to transport illegal narcotics from Bonita, California to Bell Gardens, California. NINO stated that he was going to be compensated $1,500 for successfully delivering cocaine. According to NINO, he was in contact with an acquaintance named "Carlos Ruiz." Carlos Ruiz put NINO in contact with an unidentified Hispanic female coordinator via cellular phone. NINO stated that he was instructed to meet with a Hispanic female at a gasoline station in San Diego, California to retrieve the narcotics.

24. NINO told Agents, on April 15, 2025, at approximately 5:00 p.m., he met with a Hispanic female at a Chevron gas station located at 3995 Bonita Rd., Bonita, California. NINO described the female as slender, with light skin, and approximately 33 years of age. NINO stated that she arrived at the gas station to hand him the narcotics in an older model Volkswagen Jetta. After the exchange, NINO then traveled northbound via the I-15 enroute to Bell Gardens, California. When asked by Agents why NINO utilized the I-15 instead of the I-5 to get to Bell Gardens, NINO stated that there's an active Border Patrol Checkpoint along the I-15. When asked how many times NINO has transported narcotics, NINO initially stated that this was his first time. However, NINO later stated that this was his second time transporting narcotics. NINO stated he had successfully transported narcotics in March of 2025 for which he was paid $1,500 dollars.

25. Agents asked Nino about his current immigration status in the United States. NINO admitted to entering the U.S. illegally multiple times. NINO stated that he believes he has been removed from the U.S. approximately seven times. At approximately 12:04 p.m. on April 16, 2025, the interview concluded.

### C. Drug Test

26. A total of ten bundles, two from the toolbox and eight from white five-gallon bucket, were removed from the rear bed located in V-1. SBPA Luis Silva and BPA Keith Miller took the ten bundles from V-1 into the station's evidence room to be weighed and tested. The suspected narcotics were tested again using the True Narc Tester, testing positive for properties consistent with cocaine, with a total weight of 11.4 kilograms (25.133 pounds).

### V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

27. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

   a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

      b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

      c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as email, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

      d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

## VI. **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

28.  As used herein, the term "digital device" includes the SUBJECT DEVICE.

29. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

 Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

   e. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

   f. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

  30. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

///

## VII. CONCLUSION

31. For all the reasons described above, there is probable cause to believe that NINO has committed a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii)(II). There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
Telephone on this  17th  day of
April 2025.

_____
HON. DAVID T. BRISTOW
UNITED STATES MAGISTRATE JUDGE